**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

BRIAN WATSON;
W.D.C. HOLDINGS, LLC d/b/a NORTHSTAR
COMMERCIAL PARTNERS; and
NORTHSTAR COMMERCIAL PARTNERS
MANAGEMENT, LLC,

        Plaintiffs,

v.

AMAZON.COM, INC.;
AMAZON DATA SERVICES, INC.,
f/k/a VADATA, Inc.; AMAZON WEB
SERVICES, INC.; JEFFREY BEZOS;
D. MATTHEW DODEN; ANDY JASSY;
KEITH KLEIN; YOUSRI OMAR;
CHRIS VONDERHAAR; and
DENNIS WALLACE.

        Defendants.

---

**COMPLAINT AND DEMAND FOR JURY TRIAL**

---

Plaintiffs Brian Watson ("Mr. Watson"), W.D.C. Holdings, LLC d/b/a Northstar Commercial Partners ("Northstar"), and Northstar Commercial Partners Management, LLC ("NCP Mgmt") through counsel, Jones & Keller, P.C., respectfully submit this Complaint and Demand for Jury Trial against Defendants Amazon.com, Inc. ("Amazon"), Amazon Data Service, Inc. f/k/a VADATA, Inc. ("Amazon Data"), Amazon Web Services, Inc. ("AWS"), Jeffrey Bezos ("Bezos"), Matthew Doden ("Doden"), Andy Jassy ("Jassy"), D. Keith Klein ("Klein"), Yousri Omar ("Omar"), Chris Vonderhaar ("Vonderhaar"), and Dennis Wallace ("Wallace") and states as follows:

1

## **NATURE OF THE ACTION**

1) This case arises from an improper, coordinated, anti-competitive conspiracy by Amazon to financially ruin Mr. Watson and Northstar so that Amazon could reap significant financial benefits in the development of critical data centers supporting the most lucrative arm of Amazon's sprawling business empire, web services.

2) Mr. Watson spent over two decades successfully building Northstar from the ground up into a prominent real estate investment and development firm and, leveraging his business contacts, was invited by Amazon to make a proposal for data center development in Northern Virginia.

3) Mr. Watson and Northstar pioneered a unique model of owning and building the data centers and leasing them back to Amazon; the Northstar model resulted in significant savings to Amazon, and Northstar was awarded data center contracts following a competitive bidding process. Northstar partnered equity investors in a joint venture and successfully developed two data centers in Northern Virginia, still in use by Amazon today, delivering both the data centers and promised cost savings to Amazon.

4) Just as the data center market was burgeoning and Northstar was poised to enter numerous additional data center developments with Amazon, Amazon launched a devastating, conspiratorial scheme to cut out Northstar and Mr. Watson from data center development to corner the data center market and stymie competition.

5) Jeff Bezos received a false report that Northstar had paid "kickbacks" to an Amazon employee related to the data center contracts—in actuality, Northstar had paid industry standard, legal referral fees to a Northstar business associate who had introduced Northstar to Amazon.

6)      The false report from Amazon came from a former Northstar employee who himself improperly launched his own businesses competing with Northstar and who was hoping for a financial reward from Amazon for making the false report.

7)      Amazon, without conducting a meaningful investigation and seizing an opportunity to push a competitor in Northstar out of the data center market for its own benefit, immediately sought a criminal investigation of Mr. Watson and Northstar based on the false report.

8)      The consequences for Mr. Watson and Northstar were devastating financially and personally.  Amazon, relying entirely on the false report, leveraged its significant contacts with the U.S. Department of Justice to initiate a criminal investigation of Northstar, Mr. Watson, and others.

9)      Not satisfied with the criminal investigation alone, Amazon also filed a civil lawsuit and sought an SEC investigation of Northstar and Mr. Watson.  Just as Amazon initiated this scheme, it signed agreements with Northstar's equity investor and joint venture partner to cut Northstar out of lucrative data center deals, resulting in profits for Amazon.

10)      Not only was Northstar excluded from the lucrative and rapidly expanding data center market, but it lost other investments and assets across the United States due to the improper criminal investigation.

11)      Amazon also secured appointment of a Receiver that took control of nearly all Northstar's and Mr. Watson's assets, totally hindering his ability to defend himself against the criminal investigation and massive civil lawsuit.

12)      No criminal charges were ever filed against Northstar or Mr. Watson and,

in April 2024, the DOJ announced that it was ending its investigation entirely with no charges to be filed.

13)      Similarly, the U.S. District Court for the Eastern District of Virginia granted summary judgment in favor of Mr. Watson and Northstar on nearly all of Amazon's claims.

14)      But Northstar and Mr. Watson have suffered irreparable damage from Amazon's nefarious, anti-competitive scheme to exclude them from data center development.

## **THE PARTIES**

15)      Plaintiff Brian Watson is an individual who is a resident of Colorado.

16)      Plaintiff W.D.C. Holdings, LLC d/b/a Northstar Commercial Partners is a Colorado limited liability company founded in 2000 and engaged in commercial real estate development, management and investment.  Northstar's address is 40 W. Littleton Blvd., Suite 210-133, Littleton, Colorado 80120.  The sole member of Northstar is a resident of Colorado.

17)      Plaintiff Northstar Commercial Partners Management, LLC is a Colorado limited liability company founded in 2002 and engaged in commercial real estate property management.   NCP Mgmt's address is 40 W. Littleton Blvd., Suite 210-133, Littleton, Colorado 80120.  The sole member of NCP Mgmt is a resident of Colorado.

18)      Defendant Amazon.com, Inc. d/b/a Amazon is a Delaware corporation. Amazon's registered agent is Corporation Service Company at 251 Little Falls Drive, City of Wilmington, County of New Castle, State of Delaware 19808.

19)      Defendant Amazon Data Service, Inc. f/k/a VADATA, Inc. is a Delaware corporation.  Amazon Data's registered agent is Corporation Service Company at 251

4

Little Falls Drive, City of Wilmington, County of New Castle, State of Delaware 19808.

20)    Defendant Amazon Web Services, Inc. is a Delaware corporation.  AWS's registered agent is Corporation Service Company at 251 Little Falls Drive, City of Wilmington, County of New Castle, State of Delaware 19808.

21)    Defendant Jeffrey Bezos is the founder, executive chairman, and former president and CEO of Amazon.  Bezos is the second wealthiest person in the world.  Due to his wealth and extensive influence over media, industry, and government policy, Bezos has sometimes been described as an oligarch.  Upon information and belief, Bezos is a resident of Florida.

22)    Defendant D. Matthew Doden is Senior Corporate Counsel on Amazon's Business Conduct and Ethics Team.  Upon information and belief, Doden is a resident of Washington state.

23)    Defendant Andy Jassy is the president and Chief Executive Officer of Amazon.  Jassy was formerly the SVP and CEO of AWS from 2003 to 2021.  Upon information and belief, Jassy is a resident of Washington state.

24)    Defendant Keith Klein is a real estate transaction manager for AWS.  Upon information and belief, Klein is a resident of Washington state.

25)    Defendant Yousri Omar is a director and associate general counsel at Amazon, where he leads the global business conduct and ethics team.  Upon information and belief, Omar is a resident of Washington state.

26)    Defendant Chris Vonderhaar served as Vice President, AWS Data Center Community at Amazon Web Services until June 2023 when he joined AWS competitor Google Cloud as Vice President, Demand and Supply Management. As of August 2024,

Vonderhaar joined Tract. Tract, like Northstar, is a data center land acquisition and development company. On information and belief, Vonderhaar is a resident of Washington State.

27) Defendant Dennis Wallace is Associate General Counsel, Infrastructure at AWS. Upon information and belief, Wallace is a resident of Washington state.

## JURISDICTION AND VENUE

28) This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under the Constitution and laws of the United States. Specifically, this action arises out of Defendants' violation of the Sherman Act, 15 U.S.C. §§ 1, 2.

29) This Court also has original subject matter jurisdiction under 28 U.S.C. § 1331 because the Racketeer Influenced and Corrupt Organizations Act ("RICO") is a federal statute. This Court also has supplemental subject matter jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

30) Pursuant to 28 U.S.C. § 1332(a)(1), this Court also has diversity jurisdiction over this action because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

31) This Court has personal jurisdiction over Defendants because each either can be considered essentially at home in this district or has committed acts giving rise to Plaintiffs' claims within and directed to this judicial district. Moreover, this Court has personal jurisdiction over the Defendants by virtue of 18 U.S.C. § 1965(b).

32) Venue in this District is proper pursuant to 18 U.S.C. § 1965(a) because a person against whom a RICO claim is asserted is either found, has an agent, or transacts

his affairs in this district.

33)    Venue is also proper in this Court, pursuant 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the State of Colorado with a company registered and doing business in Colorado for the past 24 years.

## GENERAL ALLEGATIONS

34)    Established in 2000, Plaintiff W.D.C. Holdings, LLC d/b/a Northstar Commercial Partners ("Northstar") is a privately held commercial real estate investment company founded in Denver, Colorado.

35)    Over the course of twenty years, its founder and CEO Brian Watson ("Mr. Watson") built the company into an outright success with approximately $1.3 billion of assets across 17 states throughout America, with more than 40 employees including internal acquisition, asset management, property management, accounting, debt, equity, and development professionals.

36)    By 2020, Northstar had acquired 140 assets, amounting to over 14.4 million square feet of real estate.  Northstar was built on hard work, grit, and entrepreneurial spirit.

37)    Consistent with this spirit, Northstar routinely worked with companies and individuals who could introduce it to potential partners for new real estate acquisitions and developments.

38)    One such individual was Christian Kirschner. For several years, Christian Kirschner introduced Northstar to contacts at major potential partners and companies across the United States.

*Amazon's Data Centers*

39)     Amazon.com, Inc. d/b/a Amazon is an American multinational technology company engaged in e-commerce, cloud computing, online advertising, digital streaming, and artificial intelligence.  Founded in 1994 by Jeffrey Bezos ("Bezos") in Bellevue, Washington, the company originally started as an online marketplace for books but grew quickly to be considered one of the "Big Five" American technology companies, along with Alphabet, Apple, Meta, and Microsoft. As of December 2024, Amazon was listed as one of the top 4 largest companies in world history, with a market capitalization of $2.35 trillion.

40)     Amazon has a reputation as a disruptor of industries through technological innovation and aggressive reinvestment into capital expenditures.  It is the world's largest online retailer and marketplace, smart speaker provider, cloud computing service provider (through AWS), live-streaming service provider (through Twitch), and Internet company as measured by revenue and market share.  Amazon has been criticized on various grounds, including but not limited to customer data collection practices, a toxic work culture, censorship, tax avoidance, and anti-competitive practices.  Given its size, reputation, and clout, Amazon wields considerable influence over industry, employment, media, news, and the government.

41)     In 2013, Amazon secured a $600 million contract with the CIA which has been described as a potential conflict of interest involving the Bezos-owned Washington Post and his newspaper's coverage of the CIA. This was followed by a bid for a US$10 billion contract with the Department of Defense. Critics have charged the federal government maintains a strong preference or bias toward Amazon for lucrative contracts

and services.

42)    A news outlet has recently reported that Amazon, the world's largest retailer, will be gifting $1 million to the inaugural committee for President-elect Donald Trump, in addition to an equal in-kind contribution of broadcasting the January 20, 2025, inauguration on Amazon's streaming platform. Upon information and belief, Amazon and Bezos are working to ingratiate themselves with the incoming administration to ensure they will maintain their access to and influence over government and politics, especially given their actions and comments made prior to President Trump being re-elected in November 2024.

43)    According to Amazon Web Services ("AWS"), it is "the world's most comprehensive and broadly adopted cloud, offering over 200 fully featured services from data centers globally. Millions of customers—including the fastest-growing startups, largest enterprises, and leading government agencies—are using AWS to lower costs, become more agile, and innovate faster."

44)    AWS has approximately 299 data centers in 20 countries across the globe. A data center is a physical location that stores computing machines and related hardware. It contains the computing infrastructure that IT systems require, such as servers, data storage drives, and network equipment. It is the physical facility that stores a company's digital data.

45)    Companies and the U.S. government pay AWS to manage their data, secure their information, and supply network infrastructure to them.  Data centers are required for AWS to provide this service, which is the largest revenue and profit driver to Amazon.

46)      Amazon Data Services, Inc. f/k/a VADATA, Inc. ("Amazon Data") is a wholly owned subsidiary of Amazon and operates data centers for Amazon and AWS in the Virginia marketplace.

47)      Bezos established a highly competitive culture at Amazon with a "win at all costs" mentality, even if that means destroying smaller companies unfairly. This culture created a ripe atmosphere for Defendants to take egregious and harmful actions against Plaintiffs, using the close relationship and control that Defendants have with the Federal Government and specifically the DOJ.

48)      Since the mid-2000, data center expansion has exploded in Virginia. Amazon, Google, and Microsoft all have a significant presence in Virginia, building their own data centers and leasing others from third parties. Amazon is thought to constitute the largest footprint of the three.

49)      Despite its parent company's Seattle roots, Virginia, especially Northern Virginia has always been the home of Amazon's cloud operations.

50)      Amazon owns or leases data centers around the Virginia counties of Haymarket, Manassas, Ashburn, Sterling, Chantilly, Warrenton, and McNair, spanning across Loudoun, Fairfax, Prince William, and Fauquier Counties.  Upon information and belief, Amazon occupies more than 50 data centers across the region, with dozens more in development.

51)      Amazon's US-East Northern Virginia cloud region has been described as the largest single concentration of corporate data centers in the world.

52)      AWS recently reported, "We remain committed to Virginia, having invested more than $63 billion in the state since 2011, with announced plans to invest $35 billion

more by 2040…Virginia is a world leader in innovation and cloud computing, thanks to its investment in a highly-skilled workforce and emphasis on long-term public and private partnerships…These robust networks are not by accident—they reflect how the internet was born as a defense communication project that grew into the modern digital revolution that we know and use in our everyday lives."

53)     Upon information and belief, Amazon's aggressive footprint is expanding south.

54)     Blair Anderson, director of AWS public policy at Amazon, in a recent blog post highlighted Amazon's close working relationship with the government in constructing its data centers: "[It] shows the impact that can happen when government and industry work together to create growth opportunities for communities."

*Mr. Watson and Northstar Enter the Data Center Development and Ownership Market*

55)     Beginning in 2017, Christian Kirschner introduced Northstar to Casey Kirschner ("Casey")—Christian Kirschner's brother—who worked as a transactional manager in the real estate department of Amazon and AWS.  The purpose of Mr. Watson engaging with Amazon/AWS was to ascertain if Northstar could develop and own data centers for Amazon on a competitive basis, as Northstar had worked for decades with large corporations and their commercial real estate.

56)     Mr. Watson toured Amazon's ongoing data center projects in Virginia with Casey, and Casey had discussions with Mr. Watson regarding his real estate investment and development experience and track record.

57)     During the tour of the Virginia market, Casey asked Mr. Watson about Northstar's capabilities, knowledge, staffing, and expertise. Casey was impressed and

thought that Northstar had the potential to be a valuable addition to the development company options that Amazon had. Casey recommended that Northstar be invited to visit Amazon's headquarters in Seattle to make a formal presentation for Amazon's data center business.  At the time, Casey had been directed by AWS leadership to find new developers to work with to build and own data centers.

58)    After the meeting with Casey, in July 2017, Northstar was invited to make a formal presentation regarding its capabilities to Amazon corporate leadership at Amazon's Seattle headquarters on August 24, 2017.

59)    The Northstar team that traveled to Seattle to present to Amazon included Mr. Watson, Donald Marcotte, Northstar's Director of Development, and Jaime Jones Vantsa, Northstar's Director of Acquisitions and Dispositions. Amazon's representatives at the presentation included Casey, Casey's supervisor Carl Nelson, and other Amazon personnel who were introduced to Northstar.

60)    Northstar was invited to participate in a competitive bidding process for Amazon's data centers in Northern Virginia, for which AWS and Amazon Data would be the exclusive tenants.

61)    During the bidding process, Northstar competed against other sophisticated developer/owners to develop and own data centers on a parcel of land in northern Virginia that Amazon had already contracted to acquire, and to lease these completed core-and-shell buildings back to Amazon, which would build these out as data centers for its use.

62)    In response to Amazon's invitation, Northstar submitted its written proposal, answered follow-up questions, and engaged in extensive negotiations with

Amazon regarding the terms of the proposal. This included input and required approvals from many different departments at Amazon, including the in-house legal department, real estate, technology, finance, and top leadership. In addition, both Amazon and Northstar were represented by sophisticated outside legal counsel during the process.

63)     Amazon told Northstar it won the bid and was awarded the opportunity to develop two initial data centers on a single site in northern Virginia (the "Dulles Site").

64)     Northstar was specifically told by Amazon that its bid was the most competitive on proposed terms. For example, data centers are typically developed at a 7% or higher yield on cost in the northern Virginia area. Northstar proposed—and eventually delivered—on development at a yield under this typical 7%, which translated into savings on the final rent for Amazon as the tenant.

65)     The first two-building project, the Dulles Site, was a success. Northstar completed these properties roughly $5 million under budget.  Amazon Data took possession of the data centers as tenant and began paying rent to the LLC investment entity that Northstar and its investment partner (together, the "Joint Venture") created for the project, on or about November 1, 2018 (for Dulles I) and March 6, 2019 (for Dulles II).

66)     Given the success of this project, Amazon asked Northstar to make additional bids and, at the right time, awarded Northstar development contracts for data centers on two additional parcels of land, for a total of nine data centers, which also proceeded successfully.

67)     All of these projects were awarded pursuant to a competitive process. Given the size, scope and operational importance of these data centers, these projects also required the approval of multiple parties, divisions, committees, and top executive

leadership within Amazon and AWS, including Bezos, Andy Jassy, then-SVP and CEO of AWS (and now President and CEO of Amazon), Chris Vonderhaar, and others.

68)     As a result of Northstar's successful development and management of the Dulles I and Dulles II projects, the Joint Venture was awarded additional contracts to construct and own data centers for Amazon called Manassas I, Manassas II, and four planned data centers on a parcel called Quail Ridge.

69)     Manassas I was completed on June 17, 2019.  Amazon Data took possession of the property as tenant and began paying rent to the Joint Venture the same day.

70)     Manassas II was completed on November 6, 2019. Amazon Data took possession of the property as tenant and began paying rent to the Joint Venture the same day.

71)     In all of these transactions, Amazon affiliate Amazon Data was the sole tenant who would occupy each building entirely under a long-term, 15-year, triple-net ("NNN") lease, with a corporate guarantee adding tremendous security and investment value for each building. Once a core and shell building was developed, then Amazon Data, as tenant, would begin paying rent, while conducting a build-out of the premises to meet their confidential specifications at a cost of $500 million to $700 million per building. This means that for each site that Northstar owned and developed for Amazon, Amazon was spending $1-$1.4 billion or more of its own money per site.  In the case of the Quail Ridge site alone, this would equate to $2-$2.8 billion of capital from Amazon, and for all 9 data centers that were planned, Amazon could have spent $4.5-$6.3 billion of its own capital investment for the build-out of the facilities.

72)     Amazon told Mr. Watson that it would receive full payback of this massive capital investment within one year from the rent it charged to house web services for the federal government and a variety of companies through AWS. By having Amazon build-out the premises to meet their specifications at their cost, it was a unique arrangement pioneered by Mr. Watson and Northstar, which vastly decreased the amount of capital required to develop the Virginia data centers, and diminished the capital exposure risk in case of tenant default or bankruptcy.

73)     To this day, Amazon continues to use and pay rent for all Northstar-built data centers. Amazon even purchased the Quail Ridge site with four of the anticipated nine data centers at cost from IPI[1], Northstar's majority equity investor in the venture, with no developer or owner profit, after Plaintiffs were wrongfully removed. Purchasing the site at cost eliminated profits both for the equity holders and for the General Partner (i.e., for Plaintiffs) but induced Amazon to award additional development contracts to IPI, in effect trading profit where Plaintiffs would be entitled to participate, for opportunity and profit in additional projects where all fees and profit would go to IPI. In fact, Amazon awarded IPI at least ten new development deals, and some of these were at the cost that Amazon purchased land sites for years prior, even though the value of the land doubled, tripled, or quadrupled since that time. Were Mr. Watson and Northstar involved in those deals, they would most likely have been paid over $100 million.

74)     Rents from the data centers are in the millions of dollars annually, and the total valuations of the completed facilities with the Amazon leases equates to hundreds

---

[1] Plaintiffs Mr. Watson and Northstar have a pending lawsuit against IPI in the District of Colorado. *Watson v. IPI*, District of Colorado Case No. 1:24-cv-02848-CNS-MEH.

of millions of dollars.

75)     Given Northstar's successful track record, many more projects were on the horizon for Northstar. At the time Northstar was developing data centers for Amazon in Northern Virginia, the company occupied approximately 45 data centers in the area. This means that with the 9 data centers Amazon awarded Northstar, that almost 20% of Amazon's data centers would have been developed and owned by Northstar. Given the demand for internet services, and the growth of artificial intelligence, machine learning, and large language models, Amazon alone is expected to build as many as 800 new data centers. Other companies, such as Microsoft, Google, and Meta, will also need ever increasing data center development services. The growth rate for data centers is expected to triple within the next three years. In sum, Mr. Watson entered the data center development market at the beginning of a modern-day Gold Rush, which has only grown massively since then.

### *Northstar Engages In Routine Real Estate Business Partnerships*

76)     As is customary in the commercial real estate business, Northstar regularly solicits introductions to potential deals, clients, and development partners from companies and individuals with contacts in various industries. Northstar had several hundred referral partners.  One such individual was Christian Kirschner.

77)     Mr. Watson met Christian Kirschner in the 1990s when they were both working as commercial real estate brokers in the Denver office of a large commercial real estate brokerage firm, representing landlords and tenants.

78)     Beginning in 2016, Northstar engaged Christian Kirschner to provide introductions to companies who may have commercial real estate needs. Christian

Kirschner was paid a base rate of $4,000.00 per month for his efforts and planned to receive an additional amount based on percentages of certain deal fees if the introductions resulted in business for Northstar.

79)    Over this period Christian Kirschner made over 1,000 introductions for Northstar. Several of these introductions resulted in business discussions for Northstar.

80)    Christian Kirschner facilitated Northstar's introduction to Amazon in July of 2017. Because this introduction resulted in significant business for Northstar, Christian Kirschner was entitled to significant fees from Northstar. Such referral fees are legal and customary in Colorado (and other states).  Northstar paid these referral fees entirely out of its own pocket from its share of normal and customary development and ownership fees it earned as the sponsor and manager of the projects.  These fees were highly negotiated to be as low as possible, by Northstar's 95% majority equity investor IPI, funded by 7 billionaires and based in Chicago, IL, and by Amazon, AWS, and Amazon Data, who were highly involved in all aspects of the final development costs and who reviewed and approved the budget to construct the buildings, which detailed these market rate development, entitlement, and leasing fees. In fact, this budget was attached to each lease as an exhibit for all parties to review and approve.

81)    Ostensibly because of the size of the anticipated fees, Christian Kirschner requested that Northstar arrange to pay the fees owed to the Villanova Trust. Christian Kirschner represented to Northstar that Villanova was a trust benefitting Christian Kirschner and his immediate family. The Villanova Trust referral agreement was drafted, reviewed, and approved by multiple professionals within Northstar, including Daniel

Mulcahy[2], its Director of Equity, Kyle Ramstetter, its Director of Project Development for the Amazon deals, its legal counsel, and Brian Watson, its Founder and CEO.

82)    Given Casey's employment with Amazon, Northstar sought to confirm that neither Casey nor his immediate family had access to the Villanova Trust funds. Christian Kirschner and his legal counsel Rodney Atherton assured Northstar and Northstar's counsel as late as the first quarter of 2020 that Casey had no access to the Villanova Trust funds.

83)    Upon receipt of these assurances, and subsequent confirmations of these assurances, Northstar agreed to pay the fees owed to Christian Kirschner to the Villanova Trust.

84)    The agreement to compensate Christian Kirschner for referring business to Northstar was not a secret. In fact, Northstar used the success of Christian's arrangement to encourage others to become referral partners. All Northstar employees knew about the referral program long before the Amazon data center projects, as Mr. Watson regularly encouraged people to participate in it. Northstar personnel involved with the Amazon projects and Northstar's business, development, and accounting personnel had copies of the agreement as they referred to it often to calculate any potential fees payable to the Villanova Trust.  The referral fees were listed in Northstar's accounting software and the wire/bank transfers clearly stated what they were for and were not hidden.

85)    Northstar had no referral agreements with Casey, Carl Nelson, or any

---

[2] Plaintiffs Mr. Watson and Northstar have a pending lawsuit against Mulcahy in the District of Colorado.  *Watson v. Mulcahy*, District of Colorado Case No. 1:24-cv-2606-GPG-NRN.

other Amazon employee, and never paid any money to them.

86)      As confirmed by the findings of the United States District Court for the Eastern District of Virginia, Amazon's employment contracts with Casey and Carl Nelson do not prohibit them from accepting referral fees relating to work they performed for Amazon, so even if they did occur, which they did not from Northstar, they would not be considered illegal.

### *Northstar Partners With Equity Investor IPI*

87)      While Northstar had the expertise to develop the data center projects at a low cost for Amazon, its business practice always involved onboarding equity investors for its projects.

88)      Northstar interviewed multiple potential capital sources to provide most of the equity required to fund the data center projects, with the remainder of the costs being funded by Northstar and its other investors and by construction debt financing that Northstar pursued and secured. In the end, Northstar selected IPI Partners as the majority equity investor, which had formed a new $1.5 billion investment fund dedicated to data center acquisitions and developments. Northstar's decision to partner with IPI was also driven by the fact that IPI was not competing with Northstar in the development business but, rather, only acting as an equity provider.

89)      In NSIPI Data Center Venture, LLC, IPI was to invest 95% of the equity, with Mr. Watson, Northstar affiliates, friends, and family investing the other 5% of the equity. That equity split was standard for institutional equity contributions in the industry for transactions of this magnitude. At times, however, IPI did not properly fund its committed share, and up to 30% of the equity for projects came from Northstar's minority

equity investors instead.

90)     In addition to profits on its equity contribution, Plaintiffs would earn various fees for their roles in acquisition, project management, entitlement, development, asset management, leasing, and property management.

91)     Northstar Commercial Partners Management, LLC ("NCP Mgmt") signed separate contracts to provide property management services for the Virginia data centers.

92)     This is a standard industry structure for large real estate development investment projects, and over time those fees can be a substantial source of revenue and profit, though the staff to support this work is also costly.

<u>*Amazon Launches A Scheme to Cut Out Northstar*</u>

93)     Understanding the lucrative nature of the Amazon data center deals and having been spoon fed the Northstar strategy, Amazon and IPI begin a campaign to push Mr. Watson and Northstar aside and engage directly. In sum, Amazon and IPI wanted to "kick out the middleman," so IPI could garner all of the development fees and building ownership profits for itself as opposed to being merely an equity investor as they had always done.

94)     First, IPI made contact with Carl Nelson, the Head of the Americas for Amazon's data center business behind Mr. Watson's back and took him to dinner in Seattle to ask him for business directly, without Northstar's consent or involvement.

95)     Next, IPI attempted to buy Northstar's Amazon business by offering to pay Northstar $20 million in the summer of 2019 to buy out Northstar's interests.  The buyout offer included the ability for IPI to hire a number of Northstar's key employees and was pitched through Northstar's Director of Development, Kyle Ramstetter.

96)     Mr. Watson and Northstar declined IPI's offer, which was well below any reasonable estimate of the value of the data centers. Later, it would become clear to Mr. Watson that the offer was an attempt to acquire Northstar's expertise, relationships, knowledge, personnel, and business.

97)     At the same time, IPI also had discussions with key development staff at Northstar without Mr. Watson's knowledge or approval as part of a third effort to take over Mr. Watson's and Northstar's business. The discussions involved IPI's investment in a land deal (known as the "White Peaks" property) that Northstar employees Kyle Ramstetter and Will Camenson usurped from Northstar, without Northstar's knowledge. IPI had discussions with Ramstetter and Camenson to pursue this transaction with Amazon directly, without Northstar, even though it knew that Ramstetter and Camenson were full-time employees of Northstar.

98)     Ultimately, Ramstetter and Camenson contracted with the seller of the White Peaks property to acquire that property for $98 million, and then sold that property to Amazon on the same day for $116 million, making an $18 million profit for themselves. The seller of this land was the same seller of the first Northstar data center land development site for Amazon, and it was through their work for Northstar that Ramstetter and Camenson met the seller and subsequently placed the White Peaks site under contract and then sold it to Northstar's tenant, Amazon/AWS.

99)     Upon information and belief, Jassy himself signed and authorized the White Peaks deal on behalf of Amazon/AWS.  Upon information and belief, Jassy, Vonderhaar, and Wallace knew or should have known that the White Peaks deal involved employees of Northstar who were usurping opportunities of Northstar.  Upon information

and belief, Jassy, Vonderhaar, and Wallace knew or should have known that Mulcahy was also attempting to engage in the same deals with Ramstetter and Camenson. Later, when Mulcahy made false allegations against Ramstetter and Northstar to Amazon in an effort to gain payment from Amazon for the false information, Jassy, Vonderhaar, and Wallace reasonably should have known that Mulcahy had ulterior motives. Instead, Jassy, Vonderhaar, and Wallace wrongfully and willfully used the information to initiate a campaign to oust Plaintiffs from their data center leases and other real estate holdings.

100) After Mr. Watson terminated Ramstetter and Camenson in October 2019 for taking the White Peaks deal from Northstar and usurping the corporate opportunity for their own gain, Mr. Watson asked Tim Lorman, Northstar's Chief Operating Officer, Brent Gray, its Chief Financial Officer, and others to work on the Amazon account, while new replacement development personnel were hired.

101) During this time of transition, IPI manufactured pretextual complaints and issues to deny payments owed to Plaintiffs in a fourth effort to "take over" the deals by yet another method after their prior plans failed. IPI's complaints had no basis in fact and IPI never provided any required formal notice (with a corresponding right to cure) to the Plaintiffs per the terms of the joint venture. Rather, it was an attempt to place additional strong-arm, mafia-like pressure on Northstar to create a divide between Northstar, its employees, and its tenant, Amazon/AWS. Ultimately, none of these supposed "issues" were based in reality, let alone material, and IPI had to look for yet another way to remove Mr. Watson and Northstar.

102) Per testimony provided by Keith Klein of AWS, it was also during this same period that Klein contacted IPI in an effort to encourage IPI to terminate its relationship

with Mr. Watson and Northstar.  Upon information and belief, Klein was acting in his own interest and on behalf of AWS, who is Klein's employer.  Upon information and belief, IPI took Klein's advice to work with Amazon in ousting Plaintiffs from their contracts.

*Mulcahy Reaches Out To Amazon Requesting A Bribe To Disclose An Alleged Bribe*

103)    Meanwhile, a former Northstar employee, Mulcahy, a person with knowledge of Northstar's real estate and leasing deals for the Amazon data centers, e-mailed Bezos on two separate occasions alleging unlawful activity by Mr. Watson, Northstar, Christian Kirschner, and the Villanova Trust.

104)    On or about November 2019, and then again on December 2, 2019, Mulcahy emailed Bezos with a request for compensation or employment in exchange for making unfounded allegations against Northstar and Mr. Watson relating to the Amazon data center deals.

105)    Perhaps to gain Bezos's attention, Mulcahy led with catchy allegations of a crime:

> Would you care to hear about a couple of your employees who have taken kickbacks in excess of $8 million, maybe as high as 50 million, and in my opinion represent a threat to the security of [Amazon]?

106)    Mulcahy continued by writing to Bezos:

> I never considered myself a rat, and I am actually on good terms with everyone involved, but I guess I am just upset that I have always acted with integrity and it is disheartening when people are rewarded so grossly for unscrupulous behavior.

107)    Mulcahy testified that he was under the belief that Mr. Watson was facilitating alleged kickbacks to Amazon employees, Casey and Carl Nelson, only based upon conversations with unnamed people at Northstar; Mulcahy testifed he had no evidence whatsoever for making his statements to Amazon. He never relayed the details

regarding his lack of concrete factual information and proof to Amazon nor did Mulcahy ever relay to Amazon that Mulcahy was involved in drafting, reviewing, and approving the referral agreement with Christian/Villanova trust.  Mulcahy's email misleadingly appeared as though Mulcahy had evidence or a factual basis for his claims against Mr. Watson and Northstar, even though Mulcahy had no evidence supporting his false claims.

108)    The timing of Mulcahy's email is especially odd.  Mulcahy waited until December 2019, to send the email, which was approximately six months after he left the employ of Northstar and soon after he hired Will Camenson, another Northstar employee, in November 2019.  Will Camenson was terminated by Northstar in October 2019 for usurpation of a corporate opportunity with Amazon (the White Peaks transaction), so it is possible that Mulcahy sent the email to Bezos in hopes of having Northstar terminated, so that Mulcahy and his new employee Will Camenson could replace Northstar with their own company.

109)    Furthering questions about the odd timing of Mulcahy's actions is the fact that one week prior to emailing Bezos, Mulcahy suddenly settled a ten-year-old tax lien for $500,000.00. Whether he did this using funds from White Peaks that his new employee Will Camenson provided to him, or someone else, is yet to be discovered.

110)    Upon information and belief, Mulcahy, via his company Dacia Capital Management had been working directly with Ramstetter and Camenson to develop data centers for Amazon and/or sell Northstar's Amazon data centers at the exclusion (or even knowledge) of Northstar while Mulcahy was working for Northstar and receiving compensation from Northstar in 2018.  Upon information and belief, Mulcahy was motivated to undermine his former-friends-turned-enemies by making false allegations to

Bezos, while trying to line his own pockets requesting a job or compensation from Bezos, or both.

111)   Mulcahy testified the statements he made to Amazon were based entirely on "assumption and hearsay" and certain comments made by former Northstar employee Ramstetter (who was terminated from Northstar for usurping Northstar's business opportunities).

112)   But Mulcahy never alerted Bezos that Mulcahy's allegations were only based on assumptions and hearsay, rather than self-greed or a personal vendetta, and Bezos apparently never tried to confirm the validity of his statements, before kicking off a firestorm against Mr. Watson and Northstar.

113)   Even so, Mulcahy made clear to Bezos that he was willing to receive compensation for his false report: "…not to mention I wouldn't turn away any compensation or some sort of professional engagement but we can see how this all plays out."

114)   Upon information and belief, Bezos personally participated in the wrongful conduct from its conception insofar as he initiated the chain of events – having been the recipient of Mulcay's false report to Amazon – that led to the damages suffered by Northstar and Watson.

115)   Upon information and belief, once Bezos directed the outcome, Jassy and Wallace worked to create the "facts" to organize Amazon's scheme to oust Plaintiffs from the data center leases, initiate a criminal investigation by the DOJ, remove Plaintiffs' real estate assets, and eventually file a civil suit against Plaintiffs to obtain a Receivership preventing Plaintiffs from defending themselves (or prosecuting Defendants for their

wrongdoing).

116)    In early December 2019, Mulcahy spoke with Amazon attorney Yousri Omar.  Following up on that call, Mulcahy sent additional documents to Yousri Omar and Matt Doden (also an attorney within Amazon) supplying additional allegations against Northstar and Mr. Watson but asking for an agreement that Amazon immunize him from potential lawsuits and keep his involvement highly confidential (upon information and belief, lawsuits against Mulcahy brought by Mr. Watson and/or Northstar).

117)    Amazon knew or should have known based upon Mulcahy's odd request that he was hiding information.  However, upon information and belief, Amazon made no separate investigation into the facts.  Upon information and belief, Amazon did not even speak with any non-attorney member of its AWS data center real estate development team prior to acting on Mulcahy's false allegations. Additionally, Amazon (per its own admission) did not review its employment contracts to analyze whether referral fees were prohibited.  Even if Mulcahy's assertions were true, which they were not, Amazon's own employment agreements with Casey and Carl Nelson do not prevent them from accepting referral fees for Amazon business (but Northstar never paid any referral fees to Casey or Carl Nelson).  Had Amazon even done a modicum of investigation into the facts, Amazon would have found those agreements in its possession and realized its legal position was untenable. Amazon apparently did no investigation whatsoever.   As Northstar's relationship and tenant, Amazon never contacted Mr. Watson or Northstar to confirm if these allegations were true, and did not provide them with a right to cure, if any improprieties did exist, which they did not.

118)    But Amazon (acting alone or in concert with another) used Mulcahy's false

allegations and the documents he provided to initiate a criminal investigation by the FBI, an investigation by the SEC, the government civil forfeiture of millions of dollars, and to start a protracted civil lawsuit against Mr. Watson and Northstar.

119)     Upon information and belief, Bezos, at all times relevant, personally directed, authorized, and controlled Amazon's scheme (and those at Amazon who perpetrated it) in his role at Amazon with the goal of gaining financial advantage for Amazon at Northstar's expense.

*Amazon Initiates An FBI Investigation, Threatens Criminal Sanctions, Files A Massive Civil Suit, And An SEC Enforcement Action*

120)     From at least January 2020 through the first days of April 2020, Amazon, in conspiracy with others, wielding its incredible influence over and access to the federal government, sought a criminal investigation into Northstar and Mr. Watson by the United States Department of Justice and apparently routinely gets its way:

> While federal officials have discretion over which criminal cases they choose to pursue, Amazon has invested significant resources into pushing prosecutors and investigators to take on cases that it prefers. And the company appears to be getting results.
>
> …
>
> Amazon has also built up an apparatus to make sure its issues get quick attention from law enforcement agencies with limited resources, in what some critics argue amounts to outsourcing what should be internal policing of its platform to federal law enforcement.

"*How one of America's largest employers leans on federal law enforcement: Amazon has increasingly tipped off the Justice Department and FBI to investigate its own employees and the sellers using its platform, according to a POLITICO analysis*." by Emily Birnbaum and Daniel Lippman, Dec. 21, 2021, https://www.politico.com/news/2021/12/21/amazon-

federal-law-enforcement-525794 (last reviewed December 16, 2024).

121)    Upon information and belief, Amazon's outside counsel and former Eastern District of Virginia Assistant United States Attorney Patrick Stokes called his former colleague and then-Eastern District of Virginia United States Attorney G. Zachary Terwilliger to request a meeting to discuss Amazon's allegations against Mr. Watson and Northstar. On information and belief, another of Mr. Stokes' former Eastern District of Virginia colleagues, then-Deputy Criminal Chief and now current United States Attorney for the Eastern District of Virginia, Jessica Aber, set up a meeting between Amazon and prosecutors. On information and belief, Ms. Aber promised Mr. Stokes that her office had specifically selected two of its best prosecutors for Amazon's "important matter."

122)    On February 19, 2020, with the DOJ meeting set for the following morning, Amazon and IPI executed an explicit, written agreement to remove Plaintiffs from their ownership stake in the IPI joint venture without Mr. Watson's knowledge or affording him his contractual right to cure any purported breach. Amazon took this step even though it was not party to the joint venture between IPI and Northstar, but instead was simply a tenant of the buildings built and owned by IPI and Northstar. This is akin to the rental tenant of an office building working with one part owner of the building to remove the other part owner's ownership stake.  Amazon kept this agreement secret from Mr. Watson, while Mr. Watson continued to direct construction and development of properties and manage the investments.  Mr. Watson continued to be the only person involved in the data center properties and projects who personally guaranteed hundreds of millions of dollars of construction debt for the projects. Instead of undertaking a good-faith internal investigation, Amazon spent its time creating a baseless power point presentation to

coerce the DOJ into investigating Mr. Watson and Northstar based on unsubstantiated allegations from strangers.

123)    With the ink still drying on the agreement they signed with IPI the day before to remove Mr. Watson and Northstar, on February 20, 2020, Amazon, Wallace, and Omar, upon information and belief, met with the in the DOJ Eastern District of Virginia to pitch their version of the "facts" to encourage an investigation and indictment of Mr. Watson in follow-up to removing Mr. Watson and Northstar from the lucrative data center leases.

124)    Wallace is Associate General Counsel for AWS Sales and Marketing. From July 2014 to October 2021, Wallace served as Associate General Counsel, AWS Infrastructure.  Upon information and belief, not only did Wallace drive the June 10, 2020, presentation to the DOJ, he was one of only four people from whom Amazon sought information about Plaintiffs prior to February 2020.  In May 2020, Wallace invited Amazon executives to meet with IPI to "help" with the investigation into Plaintiffs.  Upon information and belief, Wallace initiated the false investigation into Plaintiffs both internally and by the DOJ with knowingly false information.

125)    Omar, counsel for Amazon and head of its Business Conduct and Ethics Team, oversaw Amazon's internal investigation (or lack thereof) into the unfounded allegations against Mr. Watson and Northstar.  Omar was instrumental in coercing the DOJ to pursue Mr. Watson and Northstar.  For example, after the DOJ finally received copies of Amazon's employment agreements showing that referral fees were not prohibited, upon information and belief, Omar told the DOJ they should instead look at violations of Amazon's code of conduct because those were "legally enforceable."

Amazon had previously told courts in both New Jersey and Washington that there were no legally enforceable duties under Amazon's code of conduct.

126)   Vonderhaar oversaw Amazon's agreements with IPI including a "settlement" agreement.   Upon information and belief, Vonderhaar oversaw Amazon's agreements with IPI to press the DOJ into criminally investigating Plaintiffs over false information.   For example, Vonderhaar has testified numerous times that Amazon's only evidence that Plaintiffs engaged in any actually "wrongful" conduct was his testimony that the code of conduct prohibited certain activities.   However numerous courts (both before and after Vonderhaar maintained this stubbornly false position) have determined the code of conduct is not legally enforceable – and Amazon itself has taken this position repeatedly.   Upon information and belief, Vonderhaar knew the code was unenforceable but maintained this position in an effort to wrongly prosecute Plaintiffs, to destroy their businesses, and to remove them from their assets, including data center lease contracts and real estate holdings.

127)   Doden, Senior Corporate Counsel on Amazon's Business Conduct and Ethics Team, upon information and belief, participated in all phases of Amazon's allegations against Mr. Watson and Northstar.   Doden apparently performed a supposed internal investigation for Amazon and discussed the matter with numerous third parties including giving presentations to the DOJ in the hopes of obtaining criminal charges against Mr. Watson and Northstar, as this was the only way that Watson could be properly removed from the Joint Venture Agreement with IPI.   Upon information and belief, Doden had a significant role in gathering internal Amazon documents, including the internal Amazon approval documents provided to the government in early 2020 and

communicated extensively with the DOJ and SEC on Amazon's behalf. Doden and Omar were selective in which documents they provided to the DOJ, and conspicuously and intentionally left out vital documents such as the very employment agreements for Nelson and Casey.

128)     Upon information and belief, Bezos had full knowledge of the scheme to cut Northstar out of the data centers given the scope and scale of the data center transactions and their centrality to Amazon's web services business, the most profitable arm of Amazon's businesses.

129)     The day after Amazon made its first presentation to the DOJ, attorneys for the DOJ began calling Northstar employees in Colorado to ask questions about Amazon's allegations.

130)     Relying on the allegations from Mulcahy, IPI, and others without independent investigation or confirmation of the facts, Amazon made several subsequent presentations to the U.S. Attorney's Office for the Eastern District of Virginia to convince prosecutors to pursue criminal charges against Mr. Watson.

131)     Amazon gave at least four PowerPoint presentations to the DOJ in an effort to influence the investigations into Mr. Watson and Northstar using its in-house counsel Dennis Wallace, Omar and Doden, to pressure and cajole the DOJ to do Amazon's bidding. Amazon had over 100 meetings, 300 phone calls, and countless emails directing the DOJ and evidencing receipt of benefits to Amazon from the DOJ's efforts.  The DOJ would never meet with Mr. Watson, Northstar, or their counsel, except on a limited basis. For instance, DOJ had limited contact with Mr. Watson, Northstar, and their counsel when improprieties were discovered with the DOJ's investigation and efforts,

specifically, unconstitutional personnel misconduct by the DOJ, which led to staffing removals from the investigation. DOJ also threatened Mr. Watson and Northstar for trying to defend themselves against Amazon.  Upon information and belief, the DOJ pursued action on behalf of Amazon because Amazon is a major business partner of the federal government and spends massive sums supporting the federal government's data center needs. Upon information and belief, Amazon was also aided in its efforts to obtain an improper investigation of Northstar and Mr. Watson by hiring Stokes, a former United States Attorney for the Eastern District of Virginia, who then worked at the Gibson Dunn law firm to leverage Stokes' many connections to the DOJ. Upon information and belief, Stokes lobbied his former colleagues at the DOJ for access, favors, benefits, and actions unavailable to an average citizen or company, and which Northstar or Mr. Watson definitely did not have.

132)    Upon information and belief, Amazon's meetings with the DOJ, SEC, Northstar's employees, and witnesses whose testimony it sought to fabricate took place in person or via telephone or other digital or electronic means across state lines, including Colorado, Virginia, Nevada, California, Illinois, Tennessee, and possibly Washington state.

*Amazon's Plan Comes To Fruition*

133)    On April 2, 2020, FBI agents executed a search warrant on Mr. Watson's home in Colorado and questioned him regarding Northstar's payments to the Villanova Trust.

134)    The FBI agents seized property belonging to Mr. Watson and Northstar and indicated that Mr. Watson could soon expect a criminal indictment.

135)    Unsurprisingly, Mr. Watson was bewildered and emotional.

136)    Within hours on the same day, Northstar was immediately (and wrongfully) terminated by IPI as a member in the Joint Venture developing the Amazon data centers including Plaintiffs' role as Developer, Asset Manager, and Property Manager for the property owner LLCs, which caused the loss of over $73 million in potential compensation, as well as the loss of additional business with Amazon. Due to these investigations, Mr. Watson and Northstar were also removed from many other unrelated investments it had in 17 U.S. states, including investment funds and properties, which caused many millions of dollars in additional losses and  and the eventual destruction of Northstar. The company went from over 40 employees in the beginning of 2020, to one remaining employee now, and almost all its assets and investments lost, caused by Amazon's coordinated and massive blitzkrieg attack.

137)    The fallout from the FBI's raid and the DOJ's investigation was not limited to the (already extraordinary) loss of the Amazon deals. Rather, Mr. Watson and Northstar were removed from almost all of their other unrelated investments due to the government investigation, causing the loss of many millions of dollars and the eventual destruction of Plaintiffs. Mr. Watson's name, company, reputation, and assets were destroyed by the federal investigation and the subsequent negative media bombardment, which repeated Amazon's false allegations. In fact, Amazon repeatedly referred to Mr. Watson as a "crook" and "criminal" not only in their legal filings, but also in the press, which is an absolute abuse, slander, and defamation against Mr. Watson. According to the Denver Business Journal, Mr. Watson's demise was a top 3 business story in Denver in 2020, behind only the U.S. presidential election and the COVID-19 pandemic.

138)     Upon information and belief, prior to the FBI raid, Amazon coordinated with IPI to pay future rents to the exclusion of Northstar but Amazon never paid all the fees already earned by Mr. Watson and Northstar, thereby creating an economic windfall in favor of Amazon.  The amendment to the Northstar leases with Amazon Data were made the day of the raid, leaving the impression that Amazon knew the FBI raid was coming, and helped to coordinate and/or direct it, and worked to create new leases with IPI in anticipation of the false criminal allegations against Mr. Watson and Northstar.

139)     Without these fees (which were required to be paid to Plaintiffs), Northstar and Mr. Watson defaulted on loans and payment obligations and could not pay their office space rent, which led to a lawsuit by that landlord against Northstar. Northstar was forced to lay off almost all of its 40 employees, as the company could not meet payroll without these fees, which eliminated Mr. Watson's and Northstar's ability to work on its other investments, pursue new opportunities, and earn other fees for its work. This also prevented Mr. Watson and Northstar from pursuing other data center or investment projects at a time that market became extremely profitable. All of this was extremely stressful for Mr. Watson as the sole owner of Northstar, which led to him almost taking his own life the day of the coordinated FBI raid and due to Amazon's planned attack.

140)     Mr. Watson and Northstar were wrongfully terminated and deprived of fees and profits from the Amazon data center deals in an amount exceeding $73 million. Prior to the termination, Mr. Watson and Northstar had secured nine contracts to develop data centers for Amazon during an approximate 18-month period. On that trajectory, and with Amazon's reasonably foreseeable growth rate and tremendous need for data centers that is reflected in its actual transactions during the past few years, Mr. Watson and Northstar

could have secured another 45 to 100, or more, data center projects for Amazon. The value of those projects was enormous, generating anywhere from $365 to $800 million in fees and profits for Mr. Watson and Northstar.

141)    On the heels of Amazon's modification of the lease agreements in favor of IPI and in substantial detriment to Northstar, on May 7, 2020, IPI executed a below-market buyout of Northstar's minority investors who had participated in the Amazon deals, without any prior notice to Mr. Watson, the minority investors, or Northstar. The very moment that the nonconsensual buyout funds hit Northstar's investment entity bank accounts, they were seized through civil forfeiture proceedings based on Amazon's false allegations and their request and direction of the DOJ. The federal government held these funds for almost two and a half years and finally released all the money to the other investors without interest, on one condition: that Mr. Watson would not receive any of his rightful share of the funds. Consequently, the federal government "stole" Mr. Watson's money, and gave his property to the other investors, which they did not have any right to or ownership of.  This forfeiture and wrongful refusal to return funds to Mr. Watson hampered his legal defense and investigation, as well as the operation of his companies and estate, causing further fallout for Mr. Watson and the Northstar. Upon information and belief, Amazon and its legal counsel directed the FBI and DOJ to take these draconian actions on Amazon's behalf, in an effort to deprive Mr. Watson and Northstar of their constitutional rights, their financial ability to defend themselves as they stole the money for them to defend themselves or take legal action, all to secure financial benefits to themselves.  This was a direct and intentional "lawfare" effort against a private U.S. citizen – funded by Amazon's monopolistic trillion dollar business.

142)    Amazon's coordinated attack forced Northstar's investors into a reduced buy-out – harming Northstar's investors, Mr. Watson's business contacts, and future investments with Mr. Watson and Northstar.

143)    In December 2020, Amazon required IPI to sell the 4 building Quail Ridge site Northstar owned at cost, with no developer profit to Mr. Watson or Northstar. In return, Amazon awarded IPI ten new development deals, using land sites that Amazon had acquired years prior without requiring IPI to pay for the increase in value of those land sites, though they had increased in value 3-4 times over the original purchase price. Amazon acquired the 4 building Quail Ridge site, and never rescinded any of the 9 leases they had with Plaintiffs – but simply substituted IPI in as the recipient of the lease funds.

144)    Amazon hired the former head of the Foreign Corrupt Practices Act unit at the DOJ and former U.S. Attorney for the Eastern District of Virginia, Patrick Stokes (then at Gibson Dunn), to lobby his relationships to secure the criminal investigation into Mr. Watson and Northstar and advance the civil forfeiture actions against Mr. Watson and Northstar and others to deprive them of capital necessary to defend against Amazon and the DOJ investigation. Stokes and Gibson Dunn were also instrumental in securing a $25 million injunction and subsequent Receivership against Mr. Watson; this was based on multiple false affidavits provided by several Gibson Dunn attorneys who later withdrew these affidavits as being false once they secured the injunction and Receivership they desperately desired, using the former Federal Judge William O'Grady to impose this at the start of the case. Judge O'Grady subsequently recused himself under public pressure when it was discovered that he owned a significant amount of Amazon stock and thus had a conflict of interest.

145)    In addition, Mr. Watson and Northstar were forced to resign from their largest portfolio of 18 national assets, and Mr. Watson was forced to resign as a manager of multiple investments and investment funds.

146)    Northstar also could not pursue its planned and in-progress business. For example, it had to discontinue its efforts to launch a new $500 million data center land investment fund. Northstar also lost the opportunity to buy two iconic office buildings in Denver and Houston, as well as other assets in various markets, when news of the FBI raid broke.

147)    Mr. Watson and Northstar suffered a loss of credit and damage to their reputations, given the extremely negative news coverage and their inability to meet payment obligations, and emotional distress. In fact, Mr. Watson contemplated suicide in April 2020 and subsequently sought counseling and therapy.

148)    Mr. Watson and Northstar also incurred significant attorneys' fees associated with defending against Amazon's lawsuit and other litigation related to Amazon's false allegations of criminal wrongdoing.

149)    After approximately 4 ½ years of investigation, the U.S. Attorney's Office for the Eastern District of Virginia found no wrongdoing by Mr. Watson or Northstar, and ended its investigation, though the planned and intentional damage had been done. Indeed, Mr. Watson cooperated with the investigation. In over 30 hours in four depositions in multiple cases, Mr. Watson never asserted his Fifth Amendment rights in response to any question and substantively answered all questions to the best of his ability, both in his individual capacity and as the corporate representative of Northstar.

150)    In 2024, the DOJ announced that it would not proceed with any criminal

charges against Mr. Watson or any other of the approximate five targets, and in an historic moment, vacated several guilty pleas by others that were "not in the best interests of justice," according to Jessica Aber, the United States Attorney for the Eastern District of Virginia.    Upon information and belief, these guilty pleas were vacated following correspondence directed to federal prosecutors and counsel for Amazon targets (Will Camenson and Jason Fogle) from the federal court overseeing Amazon's civil lawsuit against Mr. Watson and Northstar.

### Amazon Files A Civil Suit, Obtains A Receiver, Then Withdraws False Affidavits Supporting Receivership

151)    Not satisfied with a criminal investigation alone to debilitate Mr. Watson and Northstar, Amazon filed a verified complaint against Northstar, Mr. Watson, and a total of 19 co-defendants on April 27, 2020, in the United States District Court for the Eastern District of Virginia for RICO, theft, fraud, conversion, constructive trust, and other claims based on unsupportable allegations of improper "kickbacks" from Northstar to Amazon employees.

152)    Nearly a month *after* filing suit, Amazon began investigating its claims against Mr. Watson and Northstar by speaking with former Northstar employees Tim Lorman and Kyle Ramstetter.

153)    Upon information and belief, in a private meeting with the Viriginia federal judge, Amazon secured a $25 million injunction against Mr. Watson and Northstar using false claims, statements, and affidavits. Because Northstar and Mr. Watson did not have $25 million to fund with the Court or to secure a bond over the injunction, a Receiver was appointed to manage all of Mr. Watson and Northstar's assets. Once the sole Receiver that Amazon recommended to the Court was put into place the day before Thanksgiving

in November 2021, Amazon and its legal counsel rescinded the multiple Affidavits they submitted as being false, though the injunction remains in place to this day, and the Receiver was in place charging Mr. Watson's company and estate up to $450,000 per month until they were finally removed at Amazon's request in May 2024 (926 days after they were originally appointed by Amazon's lawfare tactics).

154)    Judge O'Grady, who issued the injunction and appointed the only Receiver Amazon recommended, later recused himself from the case due to a conflict of interest in favor of Amazon (he was a stockholder). The Receiver hand selected by Amazon corresponded and communicated with Amazon and its legal counsel (but not with Mr. Watson, Northstar, or their attorneys) and stated "we look forward to servicing your client's needs," in a written email between Gibson Dunn and the Receivership firm of Alvarez and Marsal, even though the Receiver was supposed to be an unbiased officer of the court.

155)    Amazon's Receiver nearly destroyed Northstar entirely, which was the intent and at the direction of Amazon, so that Mr. Watson could not defend himself legally, let alone try to feed his young children and family. The Receiver charged Northstar and Mr. Watson's estate up to $450,000 per month for their services, while giving Mr. Watson a stipend of less than 30% of his stated monthly expenses to live on for almost 3 years, which devastated the company financially, destroyed Mr. Watson's and Northstar's credit and relationships, and caused emotional and psychological damage to Mr. Watson. While the Receiver racked-up bills exceeding $5 million, it neglected to pay many valid operational expenses of the companies and investments, including Mr. Watson's state and federal income taxes, which should have taken precedence over the Receiver paying

itself. Such actions, or intentional lack thereof, have caused significant harm and stress for Mr. Watson, further debilitating his ability to defend himself, to earn a living, and rebuild his life and company.

156)    After the Receiver was appointed, Amazon's lawyers withdrew multiple sworn affidavits they had filed and on which the Court had relied in support of the appointment of a Receiver and to seize Mr. Watson's assets because the affidavits were suddenly stated as being false by Amazon's legal counsel who originally filed them. Without access to his funds, Watson was rendered virtually powerless to defend against Amazon's devious scheme of utter annihilation and scorched earth tactics, using their almost endless source of capital they can use for lawfare. The withdrawal of the false affidavits came soon after a receiver was appointed, yet Amazon continued to oppose Mr. Watson and Northstar's efforts to remove the Receivership and injunction.

157)    For the first two years of the lawsuit, discovery was one-sided.  Mr. Watson and Northstar eagerly cooperated in an effort to resolve the dispute. Mr. Watson and Northstar disclosed to Amazon over one million pages of documentation demonstrating that there was nothing improper in its referral fee arrangements and data center development.  But Amazon refused to cooperate with discovery and disclosed nothing. In a Court that is known as a "rocket docket" for how quickly cases progress, Amazon constantly delayed, hoping that time, legal costs, and attrition would destroy Mr. Watson and Northstar. Upon information and belief, Amazon has spent over $100 million in its quest to destroy Mr. Watson, Northstar, and others.

158)    Two weeks after discovery opened in the civil suit and Amazon was forced to begin producing information, Amazon "liquidated" Casey's laptop, which is where

Amazon's alleged key piece of evidence (a spreadsheet outlining deals) was supposedly located. Amazon then coordinated a threatening call from the DOJ to all of defendants. The DOJ told defendants that if they refused to stay the civil case immediately, each would "get what you deserve." Upon information and belief, the DOJ was threatening criminal prosecution of defendants to shield Amazon from making its necessary discovery disclosures in the civil lawsuit because Amazon had no evidence for its claims against Mr. Watson, Northstar, or the other defendants, and that the discovery would prove the significant collusion between Amazon and the DOJ (which it did).

159)    Throughout discovery, Amazon coerced, threatened, and "prepared" several key witnesses, including Ramstetter and Christian Kirschner, prior to their second depositions, as they each asserted their Fifth Amendment rights during their first depositions. At their second depositions, Ramstetter and Kirschner were suddenly eager to talk, given the coercion, threats, and preparation of their new revised testimony by Amazon and its legal counsel. Amazon signed agreements with each, pledging not to pursue default judgments for millions of dollars against Ramstetter and Christian Kirschner's entities in return for the promise that Ramstetter and Christian Kirschner would assist Amazon against Mr. Watson and Northstar.

160)    In a recorded phone conversation from February 2024 which was released publicly during the summer of 2024, Ramstetter revealed that Amazon threatened him and coached him through his deposition in order to get him to testify against Mr. Watson and Northstar:

> KR: I don't even know where to start. First and foremost, I'm sure... I hope Carl's listening. There's a lot of... Everything was out of my control. So when I'm in depositions and this national attorney is like... And I'm being told what to say, but I didn't

fuck... I'm not Danny, I didn't... I'm on your side. I'm just being threatened with fucking everything, every component of my life, which I know you guys were too, which is like, holy shit, I didn't know what to do.

AN: Did Amazon threaten you?

KR: Oh, I can... So the reason, this call, like, we need to talk, because your TikToks and everything is like... I can go on and on. I can go on and on.

161)    148) After 926 days, the rReceiver was finally removed in May 2024, giving Mr. Watson back control of his interests, at which point almost all of Northstar's recurring fee income had been lost or given away by the rReceiver, and most of his Northstar's and Mr. Watson's assets had been sold at vast discounts to their values or lost in loan defaults and/or bankruptcy proceedings, even though Mr. Watson still has not had his fair day in court.

162)    After years of litigation, likely tens of millions of dollars spent, millions of pages of documents exchanged, and dozens of depositions, the U.S. District Court for the Eastern District of Virginia dismissed nearly all of Amazon's civil claims against Mr. Watson and Northstar, granting summary judgment in favor of Mr. Watson in March 2023 on all federal law claims. Amazon's own expert opinion report acknowledges Amazon suffered no financial damages. Indeed, apparently Amazon ratified the exact same terms it made with Northstar after IPI wrongfully terminated the relationship.

163)    The day after Amazon initially filed its lawsuit in Virgina against Northstar and Mr. Watson, Amazon coordinated a contact between the DOJ and the SEC in Denver. Upon information and belief, the DOJ sought direct contact with an SEC official who was aformer Gibson Dunn attorney; upon information and belief, this was doneat Amazon's behest using Amazon's Gibson Dunn counsel, connections, and influence.   The SEC

commenced an investigation, even though the SEC had reviewed Northstar a few months prior without any legally actionable items found.  Upon information and belief, this attack was part of Amazon's coordinated effort to deprive Mr. Watson and Northstar of adequate resources to defend themselves from Amazon's spurious claims, and to embroil Mr. Watson and Northstar in another legal battle to further deplete their funds for legal defense, and to further discredit and defame Mr. Watson and Northstar.

### *Defendants were Engaged in and have Affected Interstate Trade and Commerce*

164)     Defendants were engaged in interstate commerce including the movement of goods, services, and people between states, as well as transactions conducted across state lines via mail or electronic means.

165)     Utilizing the nationwide system of telecommunications, postal and delivery systems by means of which a substantial amount of the nation's communications and information exchanges take place, and a substantial amount of its commerce is conducted, Defendants, located in Washington state, provided information to and engaged in communications and conspiracies with IPI in Illinois and the DOJ in Virginia regarding data center real estate acquisition and construction in Virginia and coordinated an attack against Plaintiffs, in Colorado, coercing witnesses to testify untruthfully in Virginia, Tennessee, Nevada, California, and Colorado.

166)     Utilizing the nationwide network of interconnected roads and highways over or through which motor vehicles, a substantial amount of the nation's goods and a substantial number of the nation's people move in a continuous and uninterrupted stream of interstate commerce from and through one state to another, assets and materials were moved into Virginia to assist with the acquisition, construction, ownership, and control of

data centers in Virginia.

167)     Utilizing the nationwide system of banking by means of which a substantial amount of the nation's commerce is transacted, significant monetary payments have been and will continue to be made customers of the data centers to Amazon Data, being transferred to Amazon or AWS, and then to IPI, across state lines.

168)     Utilizing electronic means, Defendants' cloud computing services engage in and affect interstate commerce by providing services across state lines for numerous governmental entities and companies throughout the country from the data centers located in Virginia.

169)     Defendants' activities took place and will continue to occur in, are and will continue to be within the flow of and have and will continue to have a direct and substantial effect on an appreciable amount of, interstate trade and commerce.

### *Defendants Possess and Exercised Significant Economic Power—in the Relevant Product and Geographic Market—to Exclude Plaintiffs*

170)     A relevant market is comprised of a relevant product market and a relevant geographic market.

171)     A relevant geographic market identifies the geographic area within which competition in the relevant product market takes place.

172)     The relevant geographic market here — the area within large data centers are constructed in the United States for use by large cloud computing servicers such as AWS — may be as large as the east coast of the United States or as small as the state of Virginia itself.

173)     Defendants variously possess economic power in the relevant market in the form of the ability to exclude competition and/or control the price in the relevant

market.

174)    Defendants have variously exercised that power by excluding competition and controlling the price in the relevant market.

### *The Anticompetitive Effect of Defendants' Actions caused Plaintiffs to Suffer Injuries-in-Fact and Resulting from Injury to Competition and Therefore Unlawfully Interfered with Plaintiffs' Economic Freedom to Participate in the Marketplace*

175)    Plaintiffs incurred actual damages of billions of dollars due to Defendants' actions.

176)    In acquiring substantial commercial real estate and then constructing built-to-suit data centers for Defendants, Plaintiffs expended substantial out-of-pocket sums.

177)    Plaintiffs had already expended those funds by spring 2020 when Defendants removed Plaintiffs from the leases and future deals with Amazon, AWS, and Amazon Data.  Defendants' acts prevented Plaintiffs from obtaining development and management fees, in addition to lease fees they were entitled to.

178)    Plaintiffs thereby lost and continue to lose extensive amounts of fees they otherwise would have earned.

179)    Plaintiffs also lost the use of the real estate and buildings they constructed.

180)    The expenses incurred, the lost revenues, and the lost property constitute "injury in fact" to Plaintiffs.

181)    The ability of Defendants to determine, at their whim, to collude with other businesses and the government to deprive any potential competitor (i.e., entity attempting to acquire real estate on which to build a data center or leasing a data center) of its assets and fees has had and will continue to have actual detrimental effects on competition.

a)  It deprives consumers of the choice of pricing in using the data centers.

b)  It deprives consumers of the choice of vendors or suppliers of the services

connected with the data centers.

c) The result is that the existing data centers, including Defendants' data centers and IPI owned data centers, are — upon information and belief — able to control prices for data center customers while offering fewer amenities or services.

182)   Competition with respect to acquisition of real estate for data centers and construction and leasing of data centers in Virginia and along the east coast has been and will continue to be substantially and unreasonably limited, reduced, suppressed, foreclosed, or eliminated without any offsetting benefits in terms of savings in cost or price; without any improvements or increases in the availability, quality, variety, or utility of amenities or services; or with such benefits as may be generated, if any, being achievable by less anticompetitive means.

183)   Defendants' actions were exclusionary. They have had twin economic effects.

a) First, preventing Plaintiffs — and, as a practical matter, any other entity — from acquiring or owning real estate upon which to construct data centers or leasing the built data centers in Virginia or the east coast in competition with Defendants.

b) Second, upon information and belief, enabling Defendants and/or IPI to control prices for the long-term cloud services housed in the data centers while offering fewer amenities or services.

184)   Plaintiffs have been directly injured in their business and property as a consequence of the injuries to competition caused by the anticompetitive conduct of Defendants challenged here. As a direct and proximate result of that conduct, Plaintiffs have incurred financial expenses to acquire real estate and construct data centers; lost

significant development fees and rental income as a result of being precluded from owning and operating its data centers; and lost the significant value of their property.

185)    Plaintiffs' injuries-in-fact arise directly from the above-described exclusionary conduct of Defendants. They reflect the anticompetitive effects of the violations themselves and the anticompetitive acts made possible by those violations. They are precisely the types of losses that the violations would be likely to cause and which the antitrust laws are designed to prevent.

186)    Plaintiffs will continue to be directly injured in their business and property as a consequence of the injuries to competition caused by the anticompetitive conduct of Defendants.

187)    As a result of suffering injuries-in-fact, which flowed from anticompetitive effects and actual injury to competition, Plaintiffs have suffered antitrust injury which confers upon it antitrust standing. Plaintiffs' economic freedom to participate in the marketplace is protected by the antitrust laws.

### FIRST CLAIM FOR RELIEF
**Conspiracy in Restraint of Trade in Violation of the Sherman Act
Section 1, 15 U.S.C. § 1
(Against Defendants)**

188)    Plaintiffs incorporate all foregoing allegations of this Complaint as if fully set forth herein.

189)    Defendants have knowingly — by deliberately participating in a shared commitment to a common scheme with the intent to further its purpose—entered into a contract, combination, or conspiracy with IPI and the federal government to unreasonably restrain trade or commerce in the relevant market.

190)    Defendants, IPI, and the federal government have done so by, upon

information and belief, entering into a contract, combination or conspiracy together — regarding, among other things, removing Plaintiffs from their data center lease agreements and wrongfully taking Plaintiffs' real estate in exchange for deals between Defendants, IPI, and the federal government—in order to exclude competition in or enable the control of price over a relevant market consisting of the acquisition of real estate for construction of data centers, construction, owning, and operating data centers in the United States market.

191)    In doing so Defendants have demonstrated substantial economic power in that relevant market.

192)    The contract, combination or conspiracy is an unreasonable restraint of trade which has resulted in a substantial adverse effect on competition in that relevant market by:

a)  Excluding Plaintiffs from operating its data centers and owning and obtaining real estate to construct additional data centers, thereby restricting output in the form of data centers available and real estate available on which to construct data centers there; and

b)  Enabling Amazon and IPI to control the long-term rental price of real estate acquisition for data centers, construction of data centers, and leasing of data centers, all impacting the ultimate price to consumers of the data center services, there.

193)    As detailed above, Defendants' activities:

a)  Occurred in and affected an appreciable amount of interstate commerce; and

b)  Injured Plaintiffs in their business and property.

194)    Defendants have illegally contracted, combined, or conspired with IPI and the federal government — and will continue to do so — to restrain trade in a relevant market consisting of the acquisition of real estate for construction of data centers, construction, owning, and operating data centers in the United States market.

195)    As a proximate result, Plaintiffs have been damaged in an amount to be determined at trial, and are entitled to treble damages and attorneys' fees pursuant to 15 U.S.C. §§ 15 and 26.

**SECOND CLAIM FOR RELIEF**
**Conspiracy to Monopolize in Violation of the Sherman Act**
**Section 2, 15 U.S.C. § 2**
**(Against Defendants)**

196)    Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint as if fully set forth herein.

197)    Defendants knowingly — by deliberately participating in a shared commitment to a common scheme with the intent to further its purpose—combined or conspired with IPI and the federal government to monopolize trade or commerce in the relevant market.

198)    Defendants, IPI, and the federal government have done so by, upon information and belief, combining or conspiring together — regarding, among other things, removing Plaintiffs from their data center lease agreements and wrongfully taking Plaintiffs' real estate in exchange for deals between Defendants, IPI, and the federal government — in an effort to obtain or maintain monopoly power by excluding competition in and enabling the control of price over a relevant market consisting of the acquisition of real estate for construction of data centers, construction, owning, and operating data centers in the United States market.

199)    Defendants have variously engaged in overt acts in furtherance of that combination or conspiracy, including but not limited to:

a) Removing Plaintiffs from the lease agreements for the data centers immediately before pressing the DOJ to investigate Plaintiffs as part of the orchestrated scheme to destroy Plaintiffs and shield themselves with false criminal investigations and threats;

b) Upon information and belief, Defendants and IPI exerted power and privilege over the DOJ and SEC to ensure Plaintiffs reputations and business were destroyed so they could no longer compete with Defendants and IPI; and

c) Stifling any competition in the relevant market to the economic benefit of Defendants and IPI.

200)    Defendants had the specific intent to monopolize a relevant market consisting of the acquisition of real estate for construction of data centers, construction, owning, and operating data centers in the United States market.

a) Defendants have done so by acting with the conscious aim of using anticompetitive conduct to acquire or maintain the power to exclude competition there through, among other things, pressuring the DOJ to criminally investigate and hopefully indict Plaintiffs, and IPI to take Plaintiffs' assets and real estate from Plaintiffs and give those to Defendants in exchange for more lucrative deals in IPI's favor; and

b) Upon information and belief, Defendants have done so by acting with the conscious aim of using anticompetitive conduct to acquire or maintain the power to control prices for data center real estate acquisition, data center construction, and data center management and leasing in the United States.

201)    As detailed above, Defendants' activities:

a)  Occurred in and affected an appreciable amount of interstate commerce; and

b)  Injured Plaintiffs in their business and property.

202)    Defendants have illegally combined or conspired with IPI and the federal government — and will continue to do so — to monopolize a relevant market consisting of the acquisition of real estate for construction of data centers, construction, owning, and operating data centers in the United States market.

### THIRD CLAIM FOR RELIEF
**Contract, Combination, or Conspiracy in Restraint of Trade in Violation of the
Colorado Antitrust Act, C.R.S. § 6-4-101 *et seq.*
(Against Defendants)**

203)    Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint as if fully set forth herein.

204)    As set forth in detail above, Defendants entered into a continuing agreement, understanding, and conspiracy to attempt to drive Plaintiffs out of business through a variety of anticompetitive means.

205)    Pursuant to C.R.S. § 6-4-104, every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of trade or commerce is illegal.

206)    As a direct and proximate result of Defendants' continuing violations of the Colorado Antitrust Act, Plaintiffs have suffered and will continue to suffer injury and damages of the type that the Colorado Antitrust Act was designed to prevent. Such injury flows directly from that which makes Defendants' conduct unlawful. These damages consist of losing the ability to own and manage commercial real estate in Colorado, having business diverted to competitors who were part of the agreement, and/or having access to far fewer transactions with clients and investors than they would have with fair

competition and but for Defendants' anticompetitive agreements.

207)     Defendants' actions constitute a per se violation of the Colorado Antitrust Act, as demonstrated in the previously referenced Section of the Act.

208)     Plaintiffs seek treble damages from Defendants and all of the discretionary relief afforded under C.R.S.§ 6-4-114(2), for Defendants' violations of the Colorado Antitrust Act.

### FOURTH CLAIM FOR RELIEF
**Violations of the Racketeer Influenced and Corrupt Organizations Act
18 U.S.C.A. §§ 1962(b) and (c)
(Against Defendants)**

209)     Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint as if fully set forth herein.

210)     At all relevant times, Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3).

211)     Defendants Amazon, AWS, and Amazon Data are legal entities as limited liability companies, and the individuals Defendants were and are agents of the entities at all relevant times, and constituted an enterprise that engaged in, or the activities of which affected, interstate commerce.

212)     Alternatively or additionally, Defendants along with other individuals, formed an associated-in-fact enterprise within the meaning of 18 U.S.C. §1961(4) that engaged in, or the activities of which affected, interstate or foreign commerce. Specifically, Defendants, along with nonparties Timothy Lorman, Kyle Ramstetter, Daniel Mulcahy, and Will Camenson, associated together for the common purpose of stealing Mr. Watson and Northstar's business plans, relationships, and industry expertise, which they eventually did by committing the RICO predicate acts outlined below.

213)    The relationships and contacts among Defendants and nonparties Mulcahy and Ramstetter are extensive. They had regular meetings, telephone conversations, and other electronic communications across state lines with each other for the purpose of stealing Plaintiffs' business using illegal acts.

214)    This association-in-fact enterprise existed among Defendants and nonparties Lorman, Ramstetter, Mulcahy and Camenson from no later than the summer of 2019 until at least 2024.

215)    Defendants conducted the affairs of an enterprise and/or the association-in-fact enterprise. Specifically, each of Defendants participated in its operation or management, directly or indirectly, and did more than simply provide services to the enterprise. For example, and without purporting to be an exhaustive recitation of Defendants' conduct of the enterprise, Defendants directed the activities of Mulcahy and Ramstetter and were responsible for the strategy implemented by the enterprise to exclude Plaintiffs from their rightful business in leasing the data center. Similarly, Amazon, AWS, and Amazon Data each were responsible for the ultimate decision-making of the enterprise and provided direction to or control of the enterprise.

216)    Each of the Defendants acted to ultimately further the goal of the enterprise to, inter alia, remove Plaintiffs from their economic positions and wrest away from them any future economic opportunities in the data center development industry, namely:

- Campaigning for former Northstar personnel to falsely testify against Plaintiffs to federal authorities for a period of at least 18 months;

- Flying former Northstar personnel to Virginia, to pressure them to give false testimonies against Plaintiffs to federal authorities; and

- Promising and giving rewards to at least one former Northstar employee if he agreed to falsely implicate Plaintiffs for involvement in an alleged "kickback" scheme to federal authorities.

217)    Defendants engaged in numerous acts of racketeering activity as contemplated by the statute, including in the conduct of the enterprise, such as:

a. Witness tampering (18 U.S.C. § 1512(b) and (c)) and Conspiring to Witness Tamper (18 U.S.C. § 1512(k)): Defendants, among other things, knowing or recklessly disregarding the false and incomplete nature of the testimony they sought to have persons provide to the DOJ and with the intent that those persons provide the testimony so that Defendants could use any resulting investigation or process to steal Plaintiffs' business, corruptly persuaded, or engaged in misleading conduct toward, those persons so that those persons would provide testimony to the DOJ and at any other official proceedings to influence the DOJ to institute an investigation and process against Plaintiffs. Among other acts, Defendants wrongfully leaned on Northstar employees to corroborate Mulcahy's false statements instead of conducting an internal investigation and accepted Northstar documents it knew or should have known were stolen by Mulcahy while he was an employee at Northstar  to fabricate accusations of impropriety against Plaintiffs for practices that were standard in the.

b. In addition, Amazon pressured Kyle Ramstetter, a former Northstar employee, to lie in depositions in the civil case and concoct false allegations against Mr. Watson and Northstar. As Kyle Ramstetter himself has stated, Amazon's campaign of pressure occurred for at least 18 months and Ramstetter can provide specific dates and times of those conversations. Moreover, even if the testimony was not yet completed, Defendants agreed to influence the testimony of these persons and took steps to do so such that had those persons testified, Defendants would be guilty of offenses outlined under 18 U.S.C. § 1512;

c. Bribery of witnesses (18 U.S.C. § 201): Defendants offered compensation to persons to influence their testimony or other statements made under oath or affirmation. Specifically, Defendants offered Ramstetter value in exchange for his statements, as Ramstetter admitted on his phone call, stating, "Now, if somebody put me on the stand and said 'Did somebody want to pay you x millions of dollars to come work for them and to take over this Amazon relationship if x, and y, and z happened' I would say 'yes and here's how it happened.'" The timeline suggests that Defendants might have offered similar compensation or value to other persons;

d. Multiple instances of mail and wire fraud (18 U.S.C. §§ 1341, 1343): Defendants, acting with the intent to defraud the DOJ and other stakeholders, engaged in a scheme to obtain false or misleading statements and testimony from persons to supply to the DOJ and those stakeholders, and in doing so used the mails or wires to effectuate that

scheme. Examples of false statements that Defendants obtained or procured from persons include, but are not limited to, false statements to the DOJ concerning Plaintiffs' involvement or knowledge of improper payments or kickbacks to Amazon employees, when the payments were to the Amazon employee's brother and that brother's trust fund, which upon information and belief, were provided to the DOJ on at least two dates, February 20, 2020 and September 30, 2020, with at least 50 more meetings, calls or communications with the DOJ; further false statements to Amazon to defraud Amazon into removing Plaintiffs from deals with them and that Amazon might then transmit to the DOJ during presentations on the same dates stated above; further material omissions or misleading statements include the withholding of key facts—that Defendants knew—that would make the statements provided to the DOJ or other stakeholders not misleading, such as withholding that Plaintiffs had not made any payments to Amazon employees, that Defendants had not asked Plaintiffs about the payments, that the arrangement had been reviewed and approved by outside counsel, and that Defendants were interested in obtaining Plaintiffs' business;

e. Engaging in monetary transactions resulting from specified unlawful activity (18 U.S.C. § 1957): Defendants, acting in the jurisdiction of the United States, knowingly engaged in monetary transactions in property derived from "specified unlawful activity" of a value greater than $10,000 by engaging in the predicate acts, obtaining control over Plaintiffs' property or business and then engaging in transactions with that property or business; and

f. Travel Act (18 U.S.C. § 1952): Defendants travelled in interstate or foreign commerce to distribute the proceeds of unlawful activity and to promote, manage, establish, carry on, or to facilitate the promotion, management, establishment or carrying on, of unlawful activity and thereafter did perform or attempted to perform such acts. Specifically, Defendants often travelled in interstate or foreign commerce after committing the violations of 18 U.S.C. § 1957, above, with the intent to distribute the proceeds derived from those violations or to promote, manage, establish, carry on, or to facilitate the promotion, management, establishment or carrying on, of those violations.

218)    Moreover, these predicate acts constituted a pattern of racketeering activity that extended over a term of years. They were all acts tied to each other by common persons committing those acts (Defendants), common victims (the Plaintiffs), and a common purpose (to illegally fabricate a criminal investigation of Plaintiffs and wrest

control of the Amazon data center projects away from Plaintiffs).

219)   Defendants participated in the scheme knowingly, willfully, and with the specific intent to wrest control of Plaintiffs' data center development business from Plaintiffs to Defendants' benefit. By reason of the violations of 18 U.S.C. § 1962(c) committed by the Defendants, Plaintiffs have been injured within the meaning of 18 U.S.C. § 1964(c) in an amount to be proven at trial.

220)   Defendants also violated 18 U.S.C. § 1962(b) through the same pattern of racketeering activity outlined above. Defendants, through that pattern of racketeering activity, intended to and obtained further interests in an enterprise—the joint venture between Northstar and IPI. By acquiring such control through a pattern of racketeering activity, Defendants effectively removed Plaintiffs from their rightful positions as minority owners and managers of the joint venture. In other words, but for and by reason of the Defendants' predicate acts of racketeering activity to obtain control over the joint venture, Plaintiffs were injured in their business or property in an amount to be determined at trial.

221)   By reason of the violations of 18 U.S.C. § 1962(b) and (c) committed by Defendants, Plaintiffs were injured in their business or property, and Plaintiffs are entitled to treble damages pursuant to 18 U.S.C. § 1964(c), with interest from the date of loss, plus costs and reasonable attorneys' fees.

### FIFTH CLAIM FOR RELIEF
**Violations of the Racketeer Influenced and Corrupt Organizations Act
18 U.S.C.A. § 1962(d)
(Against Defendants)**

222)   Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint as if fully set forth herein.

223)   Defendants unlawfully, knowingly, and willfully combined, conspired, and

agreed with each other and others to conduct the affairs of an enterprise through a pattern of racketeering activity or to obtain or to maintain control of an enterprise through a pattern of racketeering activity. These acts would, if completed, constitute violations § 1962(b) and (c) in contravention of 18 U.S.C. § 1962(d).

224)     Defendants agreed with each other to commit those acts knowing the essential character of the scheme. Defendants knew that the predicate acts were in furtherance of the scheme and participated in, and agreed to the commission of, those acts in furtherance of the scheme.

225)     By reason of the violations of 18 U.S.C. § 1962(d) committed by Defendants, Plaintiffs are entitled to treble damages pursuant to 18 U.S.C. § 1964(c), with interest from the date of loss, plus costs and reasonable attorneys' fees.

**SIXTH CLAIM FOR RELIEF**
**Violation of the Colorado Organized Crime Control Act (COCCA)**
**(Colo. Rev. Stat. §§ 18-17-101 – 18-17-109)**
**(Against Defendants)**

226)     Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint as if fully set forth herein.

227)     At all relevant times, Defendants were "persons" within the meaning of Colo. Rev. Stat. § 18-17-103(4).

228)     As alleged herein, Defendants concocted, orchestrated, and directed the fraudulent and illicit scheme to create a pretext for Plaintiffs' termination from the lease agreements and management agreements and wrest control of the Amazon data center development projects away from Northstar in favor of IPI through a "pattern of racketeering activity" as defined in Colo. Rev. Stat. §§ 18-17-103(3), 18-17-103(5), including manufacturing knowingly false testimony of an alleged kickback scheme between Plaintiffs

and an employee of Amazon to induce the DOJ to launch a criminal investigation into Plaintiffs.

229)    Defendants' conduct constitutes racketeering activity under Colo. Rev. Stat. § 18-17-103(5)(b)(II) because such acts permitted Defendants to obtain Plaintiffs' assets by false pretense and misrepresentation with the intent to permanently deprive Plaintiffs of their real property and rents, and future data center development business, thereby constituting theft in violation of Colo. Rev. Stat. § 18-4-401.

230)    Defendants' predicate acts were interrelated, not isolated, and were perpetrated for the same or similar purpose: to permanently deprive Plaintiffs of their assets and rents, as well as future data center development and ownership business.

231)    These predicate acts were performed by Defendants and conducted for the purpose of using subterfuge, deceit, misinformation, and dishonest means to acquire Plaintiffs' share in the joint venture, including:

- Campaigning for former Northstar personnel to falsely testify against Plaintiffs to federal authorities for a period of at least 18 months;

- Flying Northstar personnel to Virginia, to pressure them to give false testimonies against Plaintiffs to federal authorities; and

- Promising to reward at least one former Northstar employee if he agreed to falsely implicate Plaintiffs for involvement in a kickback scheme to federal authorities.

232)    Defendants' activities occurred in Colorado within the last five years, including contacting Colorado-based witnesses, such as Lorman, Mulcahy, and Ramstetter, and tampering with their testimony, meeting with Plaintiffs in Colorado, Virginia, and Tennessee as part of their scheme, contacting the SEC in Colorado to initiate an

investigation, and usurping the business of Colorado persons and entities.

233)    As a direct and proximate result of the conspiracy, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial and are entitled to such compensatory damages caused by the violations of COCCA, plus treble damages, interest, attorneys' fees, a right or claim to the business stolen from Plaintiffs by Defendants and to the proceeds derived therefrom, and costs pursuant to Colo. Rev. Stat. § 18-17-106(7).

**SEVENTH CLAIM FOR RELIEF**
**Civil Conspiracy**
**(Against Defendants)**

234)    Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint as if fully set forth herein.

235)    Defendants agreed and conspired with each other and other non-parties (including Colorado residents Kyle Ramstetter, Tim Lorman, and Will Camenson) to cancel Northstar and NCP Mgmt's contracts and deplete Plaintiffs' assets obtain Plaintiffs' business through unlawful means, including but not limited to making and/or causing to be made knowingly false reports to the DOJ and SEC implicating Plaintiffs in an alleged kickback scheme with employees of Amazon, despite Defendants knowledge of the legitimacy of all referral fees paid by Plaintiffs to referral sources in connection with the Amazon data center projects and Amazon knowing that its contracts permitted referral fees to employees, tortiously interfering with Plaintiffs' investment partner, and tortiously interfering with Plaintiffs' contracts and future business opportunities.

236)    Defendants agreed and conspired to procure the wrongful initiation of process or a wrongful criminal conviction against Plaintiffs. Defendants undertook to accomplish these unlawful goals by engaging in various acts such as, but not limited to,

coercing or influencing the statements or testimony of persons (including Colorado residents) who would speak to the DOJ, withholding information about the propriety of payments of referral fees, and making presentations to the DOJ with the intent to secure a conviction or prosecution of Plaintiffs despite knowing that Plaintiffs had not committed any criminal act.

237)    Defendants pursued their unlawful acts or unlawful goal with the intent to eliminate payments owed to Plaintiffs and to divert data center development and ownership of previously constructed data centers and land owned by Northstar—and potential future data center development and ownership projects, given Plaintiffs' inability to take advantage of opportunities in a booming industry while under investigation—to IPI.

238)    As set forth below, these acts include the acts outlined in this complaint including civil theft; malicious prosecution; abuse of process; misappropriation of corporate opportunities;  civil theft; tortious interference with contract and/or business relations; tortious interference with prospective business and/or advantage; and defamation.

239)    As a direct and proximate result of the conspiracy, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial.

### EIGHTH CLAIM FOR RELIEF
**Civil Theft**
**(Against Defendants)**

240)    Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint as if fully set forth herein.

241)    Defendants knowingly obtained, retained, or exercised control over assets owned by Northstar without authorization, and/or by threat or deception.

242)    Defendants intended to deprive Northstar permanently of the use or benefit

of the assets; and/or knowingly used, concealed, or abandoned the assets in such manner as to deprive Northstar permanently of their use or benefit; and/or used, concealed, or abandoned the assets intending that such use, concealment, or abandonment would deprive Northstar permanently of the use or benefit; and/or demanded any consideration to which she is not legally entitled as a condition of restoring the thing of value to the other person.

243)    Northstar has been damaged by Defendants' theft in an amount to be determined at trial, plus treble damages and attorneys' fees.

<u>**NINTH CLAIM FOR RELIEF**</u>
**Malicious Prosecution**
**(Against Defendants)**

244)    Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint as if fully set forth herein.

245)    Defendants manufactured allegations against Northstar and Mr. Watson to induce the DOJ to open, and lobbied for its continuation for years, a criminal investigation into an alleged kickback scheme between Northstar and Mr. Watson and employees of Amazon, despite Defendants' knowledge of the legitimacy of Northstar's and Mr. Watson's business dealings with Amazon and used the same or similar manufactured allegations to file a lawsuit against Northstar and Mr. Watson and seek an injunction and appointment of a Receiver based on false affidavits and statements.

246)    As a result of Defendants approaching the DOJ, the FBI and the U.S. Attorneys' Office for the Eastern District of Virginia conducted a criminal investigation into Northstar and Mr. Watson, which included seeking and executing a search warrant on Watson's home, seizure of Northstar's and Mr. Watson's property, and seizure of

Northstar's investment entity bank accounts through civil forfeiture.

247)    Moreover, Defendants encouraged, by the same or similar manufactured allegations, IPI to sever contractual relationships with Northstar and Mr. Watson. Defendants knew of or recklessly disregarded the false nature of the allegations.

248)    The criminal investigation of Northstar and Mr. Watson and Amazon's civil suit benefitted Defendants, who obtained Northstar's locations for no profit and instead created a lucrative business relationship with IPI to make immense profits for themselves personally and for their investors.

249)    Defendants' pursuit of the improper investigation by the DOJ and the SEC, along with filing the civil suit to obtain a Receiver were not endeavors to seek justice. Defendants' actions were a calculated attempt to injure Northstar and Mr. Watson rather than to pursue justice.

250)    Defendants acted with malice, knew the investigation was legally indefensible, and wrongfully initiated and perpetuated the investigation against Northstar and Mr. Watson without probable cause.

251)    As a direct and proximate result of Defendants' malicious prosecution, Northstar and Mr. Watson have suffered and continue to suffer damages in an amount to be proven at trial, and are entitled to such compensatory damages, plus punitive damages in an amount sufficient to punish Defendants and to discourage, by way of example, others similarly situated to Defendants from engaging in the conduct complained herein.

### TENTH CLAIM FOR RELIEF
**Abuse of Process**
**(Against Defendants)**

252)    Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint

as if fully set forth herein.

253)     Defendants made or caused to be made knowingly false allegations of a kickback schemes between Northstar and Mr. Watson and an employee of Amazon to the DOJ and to third parties, including IPI. Defendants made these allegations with an ulterior purpose of having Northstar and Mr. Watson investigated and civilly or criminally prosecuted, creating a pretext for removing Northstar and its investors from the leases and diverting the entirety of the Amazon data center development projects to their exclusion, as well as tying up Northstar and Mr. Watson and their resources during the pendency of the investigation so they could not defend themselves or engage in competing business with Amazon to create new data center.

254)     The allegations Defendants made resulted in the institution of a proceeding to seek a search warrant, which was issued, against Northstar and Mr. Watson, creating the necessary public circumstances—an FBI raid of Watson's home, among other things—to allow Defendants to remove Northstar from the leases and other agreements.

255)     Defendants knowingly and willfully made these false representations despite full and complete knowledge of the legitimacy of Northstar's and Mr. Watson's business dealings with Amazon to the DOJ and other third parties, including IPI, which was improper. Defendants were privy to details of all Northstar's and Mr. Watson's business dealings by virtue of the parties' agreements, and the due diligence done in advance thereof, and at all relevant times had the ability to contact Northstar and Mr. Watson directly with any questions or concerns regarding Northstar's and Mr. Watson's referral sources, referral fees, and relationships with employees of Amazon. Additionally, Defendants failed to investigate and acknowledge that their employment agreements did not prohibit referral

fees to Amazon employees Casey Kirschner and Carl Nelson.

256)    As a direct and proximate result of Defendants' abuse of judicial process, Northstar and Mr. Watson have suffered and continue to suffer damages in an amount to be proven at trial, and are entitled to such compensatory damages, plus punitive damages in an amount sufficient to punish Defendants and to discourage, by way of example, others similarly situated to Defendants from engaging in the conduct complained herein.

### ELEVENTH CLAIM FOR RELIEF
**Tortious Interference with Contract**
**(Against Defendants)**

257)    Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint as if fully set forth herein.

258)    Northstar had contracts with Ramstetter and Camenson in which Ramstetter and Camenson worked for the benefit of Northstar and would not usurp Northstar's corporate opportunities.

259)    Defendants knew or reasonably should have known of the contracts.

260)    Defendants by words or conduct, or both, intentionally interfered with Ramstetter and Camenson's performance of their contracts, assisting in Ramstetter and Camenson usurping Northstar's corporate opportunities and paying to them a profit of $18 million in one day for a land sale that should have been offered to Northstar.

261)    Defendants' interference with the contracts was improper.

262)    Defendants' interference with the contracts caused Northstar damages in an amount to be determined at trial.

## TWELFTH CLAIM FOR RELIEF
### Tortious Interference with Contract
### (Against Defendants)

263)    Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint as if fully set forth herein.

264)    Northstar had a contract with IPI to be its majority equity investment partner in the data center construction and lease deals.

265)    Defendants knew or reasonably should have known of the contracts.

266)    Defendants by words or conduct, or both, intentionally interfered with IPI's performance of its contract by coercing IPI into not paying Plaintiffs for work completed and to wrongfully exclude Plaintiffs from the leases with AWS and Amazon Data.

267)    Defendants' interference with the contract was improper.

268)    Defendants' interference with the contract caused Plaintiffs damages in an amount to be determined at trial.

## THIRTEENTH CLAIM FOR RELIEF
### Defamation
### (Mr. Watson v. Defendants)

269)    Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint as if fully set forth herein.

270)    On or about January 26, 2024, Defendants made defamatory statements to the media that Mr. Watson had engaged in a "sophisticated scheme" to pay millions of dollars in "kickbacks" to Amazon employees after the DOJ had filed a motion to withdraw the guilty pleas of Ramstetter and Christian Kirschner as not in the best interest of justice. Even though the court in the Eastern District of Virginia had already ruled that "fundamental" flaws, including that Amazon could not point to any financial harm, caused most of

Amazon's civil case to be summarily judged against Amazon, Amazon continued to falsely state to the media for a wide audience that "egregious acts" of misconduct required Amazon to continue pursing Mr. Watson to "protect our interests."

271)    On or about October 1, 2024, Defendants republished the same defamatory statements to the media even though both the civil case in Virginia was mostly determined against Amazon and the DOJ had filed and the court had granted a motion to vacate the guilty pleas of Ramstetter and Christian Kirschner.

272)    Those statements were and continue to be materially false.

273)    The statements clearly concern Mr. Watson.

274)    The statements were published to third parties with actual malice.

275)    Defendant's actions caused actual or special damages.

276)    As a result, Plaintiffs Brian Watson has suffered economic and non-economic damages in amounts to be proven at trial.

## FOURTEENTH CLAIM FOR RELIEF
### Commercial Disparagement
### (Northstar v. Defendants)

277)    Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint as if fully set forth herein.

278)    On or about January 26, 2024, Defendants made defamatory statements to the media that Northstar had engaged in a "sophisticated scheme" to pay millions of dollars in "kickbacks" to Amazon employees after the DOJ had filed a motion to withdraw the guilty pleas of Ramstetter and Christian Kirschner as not in the best interest of justice.  Even though the court in the Eastern District of Virginia had already ruled that "fundamental" flaws, including that the Amazon could not point to any financial harm, caused most of

Amazon's civil case to be summarily judged against Amazon, Amazon continued to falsely state to the media for a wide audience that "egregious acts" of misconduct required Amazon to continue pursing Northstar to "protect our interests."

279)    On or about October 1, 2024, Defendants republished the same defamatory statements to the media even though both the civil case in Virginia was mostly determined against Amazon and the DOJ had filed and the court had granted a motion to vacate the guilty pleas of Ramstetter and Christian Kirschner.

280)    Defendants published false statements to third parties that were derogatory to Plaintiff's business and profession in general.

281)    By publishing those false statements, Defendants intended to cause harm to Plaintiffs' pecuniary interests.

282)    Defendants published the false statements with malice.

283)    As a result of Defendants' publication of the false statements, Northstar has suffered harm to their pecuniary interests in an amount to be proven at trial.

### FIFTEENTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Against Defendants)**

284)    Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint as if fully set forth herein.

285)    Defendants wrongfully received the benefit of Northstar's assets, including but not limited to the Quail Ridge real property along with Northstar's proprietary investment documents, trade secrets, investor lists, proprietary information, processes, and customers at Northstar's expense.

286)    Defendants received Northstar's assets under circumstances that would

make it unjust for them to retain the benefit without commensurate compensation.

287)    Defendants appreciated the benefit by using all or a portion of Northstar's assets in their business.

288)    Defendants have been unjustly enriched, at Northstar's expense and/or to Northstar's detriment, and are liable to Northstar for such unjust enrichment and/or quantum meruit because Defendants received a benefit under circumstances that would make it unjust for them to retain the benefit without paying for it.

289)    As a result, Northstar has suffered damages in an amount to be proven at trial and/or is entitled to rescission, restitution, and disgorgement to avoid unjust enrichment to Defendants.

## SIXTEENTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress/Extreme and Outrageous Conduct
### (Watson v. Defendants)

290)    Plaintiffs incorporate the allegations in Paragraphs 1-187 of this Complaint as if fully set forth herein.

291)    Defendants engaged in extreme and outrageous conduct.

292)    Defendants did so recklessly or with the intent of causing Brian Watson severe emotional and psychological distress.

293)    Defendants' conduct caused Brian Watson severe emotional and psychological distress.

294)    As a result, Plaintiff Brian Watson has suffered economic and non-economic damages in amounts to be proven at trial.

## JURY DEMAND

Plaintiffs demand a jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court enter judgment in their favor and against Defendants Amazon, AWS, Amazon Data, Bezos, Doden, Jassy, Klein, Omar, Vonderhaar, and Wallace, and to grant the following relief:

1.      In accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, as amended, Defendants shall pay to Plaintiffs an amount — the exact total of which is presently undetermined, but which is estimated to be in excess of $6 billion — equal to three times the damages sustained as a result of such antitrust violations.

2.      In accordance with Section 16 of the Clayton Act, 15 U.S.C. § 26, as amended, Defendants be permanently enjoined and restrained from engaging in the anticompetitive conduct complained of in this Complaint.

3.      In accordance with Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, as amended, Defendants shall pay to Plaintiffs their costs of suit, including a reasonable attorney's fee.

4.      Economic damages estimated at $2 billion, plus additional damages, treble damages where appropriate, and punitive damages as the Court and Jury may award, as proved at trial;

5.      Non-economic damages at the maximum rate allowed by law;

6.      Rescission, restitution, and disgorgement;

7.      Pre-judgment and post-judgment interest on all such amount at the maximum rate allowed by law;

8.      Any and all such other and further relief that the Court deems just and equitable under the circumstances.

Respectfully submitted this 23rd day of December, 2024.

/s/ Nicole A. Westbrook
Nicole A. Westbrook
Cash K. Parker
Javier J. Heres
Benjamin Brown
Jones & Keller, P.C.
1675 Broadway, 26th Floor
Denver, Colorado 80202
Office: (303) 573-1600
Facsimile: (303) 573-8133
Email: nwestbrook@joneskeller.com
        cparker@joneskeller.com
        jheres@joneskeller.com
        bbrown@joneskeller.com

*Attorneys for Brian Watson; W.D.C. Holdings, LLC d/b/a Northstar Commercial Partners; and Northstar Commercial Partners Management, LLC*